## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No: 20-cv-20389-JLK

YVETTE GOMEZ,

      Plaintiff,

v.

CITY OF DORAL,
a Florida Incorporated Municipality,
and MAYOR JUAN CARLOS BERMUDEZ,

      Defendants.

_____/

### SECOND AMENDED COMPLAINT

      Plaintiff, YVETTE GOMEZ ("Plaintiff" or "Ms. Gomez") by and through her undersigned counsel, sues Defendants, CITY OF DORAL, a Florida Incorporated Municipality ("Doral") and MAYOR JUAN CARLOS BERMUDEZ ("Mayor Bermudez") (collectively "Defendants"), and alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1. At all times material hereto, Plaintiff was and is a resident of Miami-Dade County, Florida and is otherwise *sui juris*.

2. At all times material hereto, Defendant, CITY OF DORAL, was and is a municipality in the State of Florida located at 8401 N.W. 53rd Terrace, Doral, Florida 33166.

3. At all times material hereto, Doral has operated and controlled the Doral Police Department ("Department").

4. At all times material hereto, Defendant, MAYOR JUAN CARLOS BERMUDEZ, was an elected official for Doral, acting as the head official, final policymaker, agent, and

1

representative of Doral. Mayor Bermudez as the Mayor for the City of Doral, was the employer of Plaintiff and is a state actor for purposes of 42 U.S.C. § 1983. Mayor Bermudez, in his individual capacity, is the mayor of the City of Doral and upon information and belief, Mayor Bermudez was and is a resident of Miami-Dade County, Florida and is otherwise *sui juris*.

5. This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

6. Plaintiff was at all relevant times leading up to her termination an employee and agent of Doral, as a law enforcement officer for the Doral Police Department.

7. At all relevant times, Doral was Plaintiff's employer and employed no less than fifteen (15) or more employees for each of twenty (20) or more work weeks in the current or preceding year.

8. Doral is accordingly an "employer" as defined by the Florida Civil Rights Act ("FCRA") and under Title VII.

9. Plaintiff alleges causes of action for sex discrimination and retaliation under the FCRA and Title VII, as a result of the sexual harassment she experienced by Doral and its employees, servants, agents, and officials, including Mayor Bermudez, among other causes of action.

10. The violations complained of herein occurred in Miami-Dade County, Florida.

11. As more fully set forth below, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about October 9, 2018, claiming discrimination based on sex and retaliation.

12. On May 7, 2019, after more than six months had passed from the initial filing of her Charge of Discrimination, Plaintiff requested a Notice of Right to Sue from the EEOC.

13. Furthermore, on or about June 19, 2018, Plaintiff provided notice of her potential claims to Doral's City Manager and Mayor as required by Fla. Stat. § 768.28(6).

14. On or about October 21, 2019, the U.S. Department of Justice served its Notice of Right to Sue on Plaintiff. Therefore, this Complaint is timely.

15. Plaintiff has complied with all conditions precedent to suit including compliance with Fla. Stat. § 768.28(6) and its requirements.

16. Plaintiff has accordingly exhausted her administrative remedies prior to initiating the instant suit.

17. Venue lies in the Southern District of Florida as this is where the cause of action accrued, and where the parties are located.

## FACTUAL ALLEGATIONS

18. In or about April of 2008, Ms. Gomez, a prospective female employee, interviewed for a position as a law enforcement officer with the City of Doral Police Department (the "Department").

19. During said interview, and based upon sexual animus, Chief Ricardo Gomez ("Chief Gomez"), the City of Doral Police Chief at the time, told another commander, "I do not care how great [Ms. Gomez] does, she will never be hired."

20. Chief Gomez had not had any previous interaction with Ms. Gomez and did not have any valid justification for the above comment, other than sex discrimination towards Ms. Gomez.

21. Despite the aforementioned comments and animus, due to another sergeant's recommendation and intervention and Ms. Gomez's impeccable background, she was hired as a law enforcement officer for the Department on or about April 14, 2008.

3

22. For the years that followed, while under Chief Gomez's management, Ms. Gomez failed to receive promotions and deserved commendations due to unlawful discrimination and was treated disrespectfully and differently than her male coworkers, including similarly situated male officers such as Officer Yojans Martinez, Officer Javier De La Paz, and Officer Gregory Hitchings, as a female in the Department's male-dominated work environment. These male officers and Ms. Gomez were similarly situated in all material respects besides gender, including, *inter alia*, their rank, duties and responsibilities, and experience level.

23. On or about January of 2009, a fellow officer and coworker of Ms. Gomez, Detective Anthony Rodriguez ("Detective Rodriguez"), was terminated from the Doral Police Department. Detective Rodriguez's termination was without justification and only based upon his perceived relationship with Councilmember Sandra Ruiz ("Councilmember Ruiz"), a then political adversary of Mayor Bermudez.

24. Prior to his termination, Detective Rodriguez received multiple threats emanating from the Mayor Bermudez's office and given through the Department's command staff that he would be terminated if he associated with Councilmember Ruiz, which clearly constituted an improper interference with the operations of Doral's Police Department.

25. Chief Gomez and Mayor Bermudez considered Councilmember Ruiz an obstacle and political adversary in her official position. Mayor Bermudez constantly jousted with Councilmember Ruiz during their joint political tenure.

26. Mayor Bermudez's and Doral's treatment towards Detective Rodriguez due to his political association with Councilmember Ruiz was not an isolated occurrence. The City of Doral, by and through Mayor Bermudez, had a known and widespread policy of retaliating against

4

those they perceived to be associated with Councilmember Ruiz, including, but not limited to, Ms. Gomez. For example, Officer Pablo Rodriguez was demoted twice, and Sgt. Giancarlos Pelosi and Detective Monica Vila were terminated because of their perceived association with Councilmember Ruiz. Additionally, many others, including Sgt. Chuck Weldon and Sgt. Pete Peterman, were forced to resign from the City of Doral due to the pervasive harassment and retaliation endured as a result of this same perceived association to Councilmember Ruiz.

27. Chief Gomez and Mayor Bermudez publicly articulated their desire and intent to remove Detective Rodriguez from the Department for this reason alone.

28. On or about January of 2009, shortly after Detective Rodriguez's termination, Ms. Gomez's police vehicle was maliciously set on fire while parked outside of her home.

29. Thereafter, Ms. Gomez received a phone call from Councilmember Ruiz, showing concern for Ms. Gomez's well-being. Following this phone call, the Department sent a mass email to all employees indicating that all communications with Councilmember Ruiz were to be reported to Chief Gomez. Instead of showing concern for Ms. Gomez's well-being as a victim of a malicious arson, the Department suspended Ms. Gomez for three days on pretextual grounds.

30. Following this incident, Chief Gomez and Mayor Bermudez took the stance, as they did with Detective Rodriguez, that Ms. Gomez was politically tied to Councilmember Ruiz.

31. For the years that followed, Ms. Gomez was subjected to increased harassment, discrimination, retaliation, and humiliation in the workplace, among other disparate treatment, as a woman and as a result of her connection to Councilmember Ruiz.

32. The aforementioned conduct violated Doral's own Municipal Charter.

33. Specifically, Doral, by and through its employees, agents, servants, and Mayor Bermudez, violated Article IV, Section 4.02(c)(i), which holds, in pertinent part:

> Except for the purpose of inquiries and investigations made in good faith, the Council or its members shall deal with officers and employees of the City who are subject to the direction and supervision of the Manager *solely* through the Manager, and *neither the Council nor its members shall give orders to any such officer, employee, either publicly or privately*. It is the express intent of this Charter that recommendations for improvement in City government operations by individual Members of the Council be made solely to and through the Manager. (emphasis added).

34. Doral violated the above Section when its mayor, Mayor Bermudez, a member of the Council, interfered with and ordered members of the Doral Police Department, such as Chief Organvidez and Chief Gomez, to punish, discipline, terminate, threaten, and/or harass any police officer, including Ms. Gomez, that associated with Councilmember Ruiz.

35. On one such occasion, which occurred on or about March 16, 2010, Ms. Gomez requested an extension of her maternity leave but was denied the extension although Ms. Gomez had earned the additional time off.

36. Upon her return from maternity leave, Ms. Gomez requested that her schedule be adjusted to allow her more time to tend to her newborn child, but this reasonable request was also denied.  Other male officers, such as Detective Luis Fernandez, requested schedule changes around this same time and these requests were granted without issue.

37. Shortly after Ms. Gomez's return from maternity leave, false rumors began to circulate that Ms. Gomez was going to work in pajamas. On or about November of 2010, Ms. Gomez was reprimanded for wearing "pajamas", meaning jeans, on Sundays. Many similarly situated male officers, including, but not limited to, Detective Rafael Baena, Officer Jorge Garcia, Officer Yojans Martinez, Officer Angel Travieso, and Officer J. Polanco, wore

jeans on the weekends, but Ms. Gomez, a female, was the only officer reprimanded for this common practice.

38. In furtherance of the retaliatory and discriminatory conduct towards Ms. Gomez, Ms. Gomez learned that requests were made from City Hall for Department officials to monitor the surveillance cameras specifically to spy on Ms. Gomez, a practice not applied to male officers.

39. Police surveillance cameras are intended to be utilized in significant criminal investigations or acts of significant malfeasance and not for discriminatory purposes and targeted harassment of individual employees.

40. Since Ms. Gomez's pregnancy and  political association with Councilmember Ruiz, as set forth above, it became increasingly clear that the Department's command staff was targeting Ms. Gomez, a female, attempting to manufacture any excuse to unfairly discipline her and utilizing false information in a prelude to terminate her.

41. On or about April of 2011, an anonymous source sent a letter to the Miami-Dade State Attorney's Office, accusing the Doral Police Department and Chief Gomez of impropriety and criminal activity.

42. As a result of the letter, the Florida Department of Law Enforcement ("FDLE") commenced an investigation into the allegations of misconduct.

43. Ms. Gomez, as any other private citizen who possessed relevant information would be, was asked to be a witness and cooperate with the FDLE investigation of Chief Gomez.

44. The FDLE Investigative Summary included Ms. Gomez's statement which consisted mostly of Ms. Gomez's personal knowledge of information relevant to the investigation, her experiences while working for the City of Doral, and contact information of potential

witnesses that could help the FDLE with its investigation. The FDLE Summary provided that, "Officer Gomez was questioned on Wednesday, April 20, 2011, at the FDLE MROC, where she rendered a sworn, digitally recorded statement in the presence of SA Saladrigas and SAS Breeden. She confirmed that she had heard rumors of an anonymous letter that had reportedly been sent to the SAO, the Doral City Council, and the Doral City Manager, but she denied having ever seen the letter before that date. Officer Gomez went on to describe a series of problems that she had experienced with Chief Ricardo "Ricky" Gomez. Most of the problems seemed administrative in nature… However, Officer Gomez did go on to identify several current and former employees of the Doral Police Department, who, according to sources, did have direct and indirect information about alleged criminal activity involving the Chief of Police and certain members of his command staff."

45. Ms. Gomez's statements, as set forth above, were made as a private citizen and not pursuant to her official duties as a detective for the City of Doral. Ms. Gomez's official duties as a detective with the City of Doral involved investigating suspected crimes, gathering evidence, and interviewing suspects, among other duties, for the City of Doral's criminal cases. None of her official duties were implicated in this FDLE investigation, where she served as a witness speaking on a matter of public concern and not as the investigator.

46. As a direct and proximate result of Ms. Gomez's statement and her cooperation with the FDLE, Ms. Gomez was wrongfully labeled as the whistleblower who reported the Department's illegal conduct and subsequently retaliated against. In other words, Chief Gomez and Mayor Bermudez believed Ms. Gomez to be the author of the anonymous letter and the discriminatory conduct against her increased thereafter.

47. The FDLE investigation ultimately found Chief Gomez to have violated multiple Department policies. On or about December of 2012, Chief Gomez was officially terminated as a result thereof.

48. While Mayor Bermudez and Chief Gomez were in office, Ms. Gomez, a female, was continuously harassed and defamed, without any support from the Department's command staff.

49. In November of 2012, the City of Doral finally elected a new mayor to succeed Mayor Bermudez.

50. Over the years that followed, Ms. Gomez was promoted to sergeant while under Chief Richard Blum's and Mayor Luigi Boria's administration and then promoted to lieutenant while under Chief Donald De Lucca's ("Chief De Lucca") administration. Treatment of the Ms. Gomez significantly improved under these succeeding administrations, especially from the Department's command staff. In fact, Ms. Gomez's evaluations markedly improved under these administrations and were almost always exceptional.

51. Ms. Gomez's quality of work and work ethic were never the issue in Ms. Gomez's professional advancement and duties. The harassment and sex discrimination Ms. Gomez was subjected to under the previous administration, including her lack of advancement, was a product and result of Mayor Bermudez's, and the police chiefs appointed by Mayor Bermudez, personal bias and vendetta against Ms. Gomez for her political affiliation with Councilmember Ruiz, her truthful testimony in an FDLE investigation, and her sex as a female.

52. On or about November of 2016, Mayor Bermudez was re-elected as Mayor for the City of Doral. Shortly after his reelection, in furtherance of his animus towards Ms. Gomez, Mayor Bermudez publicly disparaged Ms. Gomez to the command staff of the Department.

53. Furthermore, upon his reelection, Mayor Bermudez continued and enhanced his discriminatory actions towards Ms. Gomez.

54. In or about January of 2017, Mayor Bermudez became irate and made disparaging comments to the Department's command staff about Ms. Gomez when he learned she had been promoted to lieutenant.

55. In or about March of 2017, Ms. Gomez, a single mother, was reassigned to work midnight shifts, as a direct result of Mayor Bermudez's directives to harass and discriminate against her. Lieutenant Orlando Sanchez, a similarly situated male lieutenant and ally of Mayor Bermudez, was allowed to work the day shift that had previously been assigned to Ms. Gomez.

56. In or about April of 2017, Ms. Gomez requested authorization to leave the limits of the City of Doral for a short period of time due to a scheduling conflict involving her children. Major Jose Seiglie ("Major Seiglie") authorized Ms. Gomez to do so for any future scheduling conflicts as long as she had her radio on and was able to respond to critical calls. It should also be noted that the scheduling conflict solely arose due to the reassignment of Ms. Gomez to midnight shifts.

57. Ms. Gomez was assured the accommodation was approved as lieutenants are rarely assigned to respond to calls and enjoy heightened flexibilities with their work schedules. In fact, similarly situated male lieutenants, such as Lt. Orlando Sanchez, Lt. Daniel

Munecas, Lt. Yojans Martinez, and Lt. Gary King, normally enjoyed the same accommodations without issue.

58. In or about June of 2017, Payroll Specialist Maria Basulto ("Basulto") resigned from her position with the Department.

59. In addition to her normal duties, and to provide interim continuity to the payroll department until a replacement was hired, Ms. Gomez, who had been trained in payroll procedures and had helped complete payroll with Basulto for almost four years, agreed to fill in for Basulto in her absence and to input payroll information for Department personnel. Ms. Gomez did so on a program called Kronos with the help of Human Resources Assistant Director, Rita Garcia ("Garcia"), during Hurricane Irma.

60. The Department's supervisors and command staff were aware of and appreciated the aid Ms. Gomez provided to the payroll department in assuming these additional duties. In fact, Ms. Gomez would directly communicate with coworkers and supervisors about their schedules and overtime so that she could input the correct information.

61. Ms. Gomez's squad commended and appreciated her dedication to payroll and overtime worked during a hurricane.

62. During Hurricane Irma, one of Ms. Gomez's squad members observed Mayor Bermudez and others drinking alcoholic beverages while working in the command center. Instead of demonstrating regret and embarrassment, Mayor Bermudez and his staff told the observing officer to mind their "own business" and to be silent about what they had observed. While Ms. Gomez did not personally witness this incident or report it, Ms. Gomez was wrongfully accused of having reported the incident to the Ethics Committee.

63. Despite Ms. Gomez's efforts and dedication to payroll during the hurricane, Garcia, at the direction of the command staff, falsely accused Ms. Gomez of improperly participating in payroll procedures. Ms. Gomez was wrongfully suspended and disciplined for three weeks as a result and was not paid for the sixty additional hours of overtime she worked during Hurricane Irma.

64. In or about December of 2017, as a result of the Kronos incident where she was falsely accused and reprimanded on pretextual grounds, Ms. Gomez did not receive her annual raise. Furthermore, Ms. Gomez's evaluation was initially excellent and commended Ms. Gomez for her Kronos initiative, especially after Basulto's resignation. However, Ms. Gomez's evaluation was subsequently changed and lowered due to the false disciplinary matters relating to the payroll incident. There was no question that Ms. Gomez's evaluation was altered at the direction of the command staff and not as a result of her supervisors' evaluation.

65. For the months that followed, Ms. Gomez was consistently harassed, micromanaged, and instructed by her supervisors to wrongfully and unjustifiably reprimand and evaluate several of the female officers under her command, including those that had witnessed Mayor Bermudez drinking alcohol during Hurricane Irma.

66. In a series of attempts to harass and retaliate against her and to interfere with her child care schedule, the Doral Police Department changed the lieutenant's schedules to twelve hours a day instead of ten hours a day in or about of January of 2018, while Ms. Gomez was on her three-week suspension. Ms. Gomez pleaded that her schedule be accommodated due to her minor children, but this request was denied.

67. Shortly thereafter, Ms. Gomez had a meeting with Captain Rodriguez and Major Seiglie, wherein they explicitly allowed Ms. Gomez to accommodate her schedule, giving their approval. Inexplicably, and contrary to standard practice, they indicated that this conversation should not be reduced to writing.

68. In late March of 2018, Ms. Gomez was advised by Captain Carlos Arango ("Captain Arango") that a tracker had been placed on her police vehicle to track when Ms. Gomez was leaving the limits of the City while on duty and that Mayor Bermudez was the complainant.

69. Ms. Gomez explained that she was not violating any directive since she had her superiors' express permission. Nonetheless, Ms. Gomez was informed that, if questioned, her supervisors would deny this and would not support Ms. Gomez.

70. Ms. Gomez was also advised that she should resign from her position before she was discriminatorily terminated.

71. Many Florida police departments have a policy wherein they refuse to hire any law enforcement officers that have a prior termination from a law enforcement position as part of their record. Knowing this, Ms. Gomez knew that a termination would permanently jeopardize her ability to ever work in another law enforcement agency.

72. On or about April of 2018, Chief Hernan Organvidez ("Chief Organvidez") was appointed, and as a close ally of Mayor Bermudez, continued to target and harass Ms. Gomez.

73. As a result of the aforementioned harassment, discrimination, persecution, and threat of termination, including, but not limited to, tracking Ms. Gomez's police vehicle, spying on Ms. Gomez with surveillance cameras, disparaging her name and falsely accusing her of violating department policies, as perpetrated by Mayor Bermudez and the police

department's command staff, Ms. Gomez's working environment grew incredibly hostile, discriminatorily abusive, and intolerable to the point that she was forced to resign.

74. It should be noted that prior to her termination, Ms. Gomez consistently complained of and reported these discriminatory acts to her supervisors, such as Gracia, every time an incident would arise. However, her complaints were often left unresolved and she continued to be subjected to the same harassment and discrimination. Ultimately, Ms. Gomez reported the ongoing issues to the Human Resources Department to HR Director Jorleen and Assitant HR Director Isabel. However, once again, her complaints were ignored, leaving Ms. Gomez with no administrative remedies.

75. On April 10, 2018, Ms. Gomez was constructively terminated and forced to resign from her position as Lieutenant for the Doral Police Department as a result of the abusive and intolerable working environment.

76. Ms. Gomez was understandably devastated as it had been her long-term career goal to become a Police Chief in the future.

77. Although Doral had not commenced an internal affairs investigation prior to Ms. Gomez's termination, an IA investigation was commenced and post-dated after Ms. Gomez's termination in order to further damage her reputation and record. The Doral Police Department fraudulently and falsely labeled Ms. Gomez as having resigned during an open investigation on the FDLE Automated Training Management System, so as to jeopardize Ms. Gomez's future employment opportunities.

## COUNT I – SEX DISCRIMINATION AGAINST DORAL
### Under Florida Civil Rights Act of 1992 (FCRA), 760.01 et seq., Fla. Stat

Ms. Gomez repeats and realleges each and every allegation set forth in paragraphs 1 – 77 as if fully set forth herein.

78. As set forth previously, Doral is an "employer" under the FCRA.

79. Section 760.10 of the FCRA states in relevant part:

> "(1) It is an unlawful employment practice for an employer:

>> To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, national origin, age, handicap, or marital status."

80. The FCRA accordingly prohibits discrimination based on sex.

81. The treatment and discrimination to which Ms. Gomez was subjected by Doral, as set forth above and incorporated herein, was the result of Ms. Gomez's sex/gender, which male individuals were not and would not have been subjected, in violation of the FCRA.

82. Ms. Gomez was clearly qualified for her job as she had received countless positive performance evaluations and had been employed by Doral for almost ten years.

83. Ms. Gomez was subjected to multiple adverse employment actions, including discrimination, harassment, retaliation, and ultimately, termination, as more fully set forth above.

84. Similarly situated male employees, such as Lt. Orlando Sanchez, Lt. Daniel Munecas, Lt. Yojans Martinez, Lt. Gary King, Detective Rafael Baena, Officer Jorge Garcia, Officer Angel Travieso, Officer J. Polanco, Officer Javier De La Paz, Detective Luis Fernandez, and Officer Gregory Hitching were treated more favorably than Ms. Gomez, as set forth in previous examples. The foregoing male individuals are similar to Ms. Gomez in all relevant respects, including rank, experience level, and assigned duties.

85. The acts of sex discrimination described hereinabove including, but not limited to, assigning Ms. Gomez to midnight shifts, failing to pay her for overtime worked, wrongfully suspending her and accusing her of improperly participating in payroll, tracking her police

vehicle, publicly disparaging her to her coworkers, improperly lowering her evaluation, among other discriminatory actions, constituted adverse employment actions and were sufficiently severe and pervasive so as to create an intolerable hostile working environment, affecting the terms and conditions of the Ms. Gomez's employment, including but not limited to, causing Ms. Gomez's constructive termination.

86. The acts of sex discrimination described hereinabove were unwelcome and offensive to Ms. Gomez.

87. Doral's alleged bases for its adverse conduct against Ms. Gomez and Ms. Gomez's termination are pretextual and asserted only to cover up the discriminatory nature of its conduct.

88. Even if Doral could assert legitimate reasons for its adverse actions against Ms. Gomez and her termination, which reasons it does not have, Ms. Gomezs sex/gender was also a motivating factor for Doral's adverse conduct toward Ms. Gomez and Ms. Gomez's termination.

89. Doral, as the employer of Ms. Gomez, failed to take any prompt and effective remedial action reasonably calculated to result in the prevention and/or remedy of the sex discrimination of Ms. Gomez.

90. As a result of the aforementioned discrimination, Ms. Gomez was constructively discharged.

91. Furthermore, as a result of Doral's discriminatory actions as a result of her sex, Ms. Gomez has experienced and will continue to experience significant financial and economic loss in the form of lost wages and lost benefits. Ms. Gomez has also experienced and will continue to experience emotional anguish, pain and suffering and loss of dignity damages. Ms.

Gomez accordingly demands lost economic damages in the form of back pay and front pay, interest, lost benefits, and compensatory damages.

92. Ms. Gomez further seeks her attorney's fees and costs as permitted by law.

WHEREFORE, Ms. Gomez prays for the entry of a judgment against Doral and an award of economic damages in the form of back pay and front pay, lost wages, interest, lost benefits, pre and post judgment interest, as well as compensatory damages and attorney's fees and costs as a result of Doral's discriminatory conduct in violation of the FCRA and any and all other relief this court deems just.

## COUNT II – SEX DISCRIMINATION AGAINST DORAL
### Under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000.

Ms. Gomez repeats and realleges each and every allegation set forth in paragraphs 1 – 77 as if fully set forth herein.

93. Ms. Gomez is a woman and is an "individual" and "employee" under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq.

94. Doral is a "person" and an "employer" of the Ms. Gomez under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq.

95. Title VII of the Civil Rights Act of 1964 states, "It shall be an unlawful employment practice for an employer - (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin…" 42 U.S.C. §2000e et seq.

96. The acts of sex discrimination described herein were done on account of the Ms. Gomez's sex.

97. Ms. Gomez was clearly qualified for her job as she had received countless positive performance evaluations and had been employed by Doral for almost ten years.

98. Ms. Gomez was subjected to multiple adverse employment actions, including discrimination, harassment, retaliation, and, ultimately, termination.

99. Similarly situated male employees, such as Lt. Orlando Sanchez, Lt. Daniel Munecas, Lt. Yojans Martinez, Lt. Gary King, Detective Rafael Baena, Officer Jorge Garcia, Officer Angel Travieso, Officer J. Polanco, Officer Javier De La Paz, Detective Luis Fernandez, and Officer Gregory Hitching were treated more favorably than Ms. Gomez, as set forth in previous examples. The foregoing male individuals are similar to Ms. Gomez in all relevant respects, including rank, experience level, and assigned duties.

100.    The acts of sex discrimination described hereinabove including, but not limited to, assigning Ms. Gomez to midnight shifts, failing to pay her for overtime worked, wrongfully suspending her and accusing her of improperly participating in payroll, tracking her police vehicle, publicly disparaging her to her coworkers, improperly lowering her evaluation, among other discriminatory actions, constituted adverse employment actions and were sufficiently severe and pervasive so as to create an intolerable hostile working environment, affecting the terms and conditions of the Ms. Gomez's employment, including but not limited to, causing Ms. Gomez's constructive termination.

101.    The acts of sex discrimination described hereinabove were unwelcome and offensive to the Ms. Gomez.

102.    Doral knew or should have known of the acts of sex discrimination described hereinabove and failed to take prompt corrective action to remedy the harassment, and at all times relevant to this action, the employees, agents, and elected officials, such as Mayor

Bermudez, referred to herein were in the control of Doral and the officials of the Department referred to hereinabove were employees and/or agents of Doral and were acting in the course and the scope of their authority.

103.    The foregoing acts of sex discrimination violated Ms. Gomez's right to be free from sex discrimination under Title VII.

104.    As a direct result of the foregoing acts of sex discrimination, Ms. Gomez has lost wages and other employment benefits and/or has suffered emotional distress, humiliation, embarrassment, anguish and loss of enjoyment of life and was constructively terminated.

WHEREFORE, Ms. Gomez prays for the entry of a judgment against Doral and an award of economic damages in the form of back pay and front pay, lost wages, interest, lost benefits, as well as compensatory damages and attorney's fees and costs as a result of Doral's discriminatory conduct in violation of Title VII.

## COUNT III – HOSTILE WORK ENVIRONMENT AGAINST MAYOR BERMUDEZ

Ms. Gomez repeats and realleges each and every allegation set forth in paragraphs 1 – 77 as if fully set forth herein.

105.    Mayor Bermudez maintained a hostile working environment contaminated by a pattern of offensive conduct directed at women and, in particular, Ms. Gomez. Such conduct was severe, pervasive and ongoing.

106.    The acts of sex discrimination described herein were done on account of the Ms. Gomez's sex.

107.    Ms. Gomez was clearly qualified for her job as she had received countless positive performance evaluations and had been employed by Mayor Bermudez and Doral for almost ten years.

19

108.    Ms. Gomez was subjected to multiple adverse employment actions, including discrimination, harassment, retaliation, and ultimate termination by Mayor Bermudez, in his individual capacity.

109.    Similarly situated male employees, such as Lt. Orlando Sanchez, Lt. Daniel Munecas, Lt. Yojans Martinez, Lt. Gary King, Detective Rafael Baena, Officer Jorge Garcia, Officer Angel Travieso, Officer J. Polanco, Officer Javier De La Paz, Detective Luis Fernandez, and Officer Gregory Hitching were not subject to the same harassment by Mayor Bermudez and were treated more favorably than Ms. Gomez, as set forth in previous examples. The foregoing male individuals are similar to Ms. Gomez in all relevant respects, including rank, experience level, and assigned duties.

110.    The acts of sex discrimination described hereinabove including, but not limited to, assigning Ms. Gomez to midnight shifts, failing to pay her for overtime worked, wrongfully suspending her and accusing her of improperly participating in payroll, tracking her police vehicle, publicly disparaging her to her coworkers, improperly lowering her evaluation, among other discriminatory actions, constituted adverse employment actions and were sufficiently severe and pervasive so as to create an intolerable hostile working environment, affecting the terms and conditions of the Ms. Gomez's employment, including but not limited to, causing Ms. Gomez's constructive termination.

111.    The acts of sex discrimination described hereinabove were unwelcome and offensive to the Ms. Gomez.

112.    Mayor Bermudez engaged in the discriminatory practices complained of herein.

113.     Mayor Bermudez knew or should have known of the acts of sex discrimination described hereinabove and failed to take prompt corrective action to remedy the harassment.

114.     Under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, Ms. Gomez has a right to be free from sexual harassment, gender discrimination and retaliation in her employment. Mayor Bermudez, in his individual capacity, under the color of state law, and in violation of 42 U.S.C. § 1983, purposefully deprived Plaintiff of clearly established federal statutory and constitutional rights by subjecting her to intentional and unlawful discriminatory practices based upon her sex by, among other things, maintaining a sexually hostile work environment, discriminating against her on the basis of gender *vis-a-vis* promotion opportunities, by engaging in acts of disparate treatment with respect to discipline, terminating her employment and by engaging in continuing pattern and practice of retaliatory conduct against Plaintiff, and in other terms, conditions, and privileges of Plaintiff's employment.

115.     As a direct result of the foregoing acts of sex discrimination, the Ms. Gomez was constructively terminated and has lost wages and other employment benefits and/or has suffered emotional distress, humiliation, embarrassment, anguish and loss of enjoyment of life.

WHEREFORE, Ms. Gomez prays for the entry of a judgment against Mayor Bermudez and an award of economic damages in the form of back pay and front pay, lost wages, interest, lost benefits, as well as compensatory damages and attorney's fees and costs as a result of Mayor Bermudez's discriminatory conduct in violation of Title VII.

## COUNT IV – CIVIL RIGHTS VIOLATION
## UNDER 42 U.S.C. 1983 AGAINST DORAL

Ms. Gomez repeats and realleges each and every allegation set forth in paragraphs 1 – 77 as if fully set forth herein.

116.  42 U.S.C. Section 1983 states as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...

117.  Doral is a "person" for purposes of Section 1983 and Doral is therefore a proper defendant in this Section 1983 Action.

118.  Doral, under color of law, by the enforcement of a municipal policy, a municipal practice, or a decision of a municipal final policymaker, subjected Ms. Gomez to the deprivation of her right to Freedom of Association pursuant to the First Amendment to the United States Constitution, and is therefore liable for the damages and other relief sought in this Action.

119.  Ms. Gomez was an employee of Doral until her constructive termination from employment in or about April 2018.

120.  For the majority of Ms. Gomez's employment, and at all times relevant hereto, the City of Doral's Mayor and final policymaker was Mayor Bermudez.

121.  Upon information and belief, Mayor Bermudez and Chief Gomez believed that Ms. Gomez was associated with Councilmember Sandra Ruiz.

122.  This belief was partly based on phone calls and common friends between Councilmember Ruiz and Ms. Gomez.

123.     Ms. Gomez's employment did not require a political affiliation. However, as an employee of the Doral Police Department, Ms. Gomez was not allowed to publicly support Councilmember Ruiz while on duty. However, she did politically associate and align herself with Councilmember Ruiz's beliefs while off-duty, like Detective Rodriguez and the other officers mentioned.

124.     At all material times hereto, Ms. Gomez's conduct and political affiliation constituted an individual, legally protected association under the First Amendment to the United States Constitution.

125.     It was the policy and practice of Doral and the Doral Police Department, by and through Mayor Bermudez and other employees, agents, officers, and appointed officials, to not associate with political adversaries such as Councilmember Ruiz.

126.     Throughout his tenure, and as Doral's top policy maker, Mayor Bermudez would command and direct the Doral Police Department chiefs, including Chief Organvidez and Chief Gomez, to forbid any officer and/or employee from associating with Councilmember Ruiz. Any violation of his command would result in the employee's termination or other adverse employment action, such as that endured by Ms. Gomez and Detective Rodriguez. Additional examples of this widespread policy include Officer Pablo Rodriguez's demotions and Sgt. Giancarlos Pelosi's and Detective Monica Vila's termination because of their perceived association with Councilmember Ruiz. Additionally, many others, including Sgt. Chuck Weldon and Sgt. Pete Peterman, were forced to resign from the City of Doral due to the pervasive harassment and retaliation endured as a result of this same association to Councilmember Ruiz.

127.     Due to information and belief that Ms. Gomez was a political supporter of Councilmember Ruiz, Doral, through Mayor Bermudez, Chief Gomez, and Major Seiglie, and their agents, employees, servants, officers, captains, and lieutenants, threatened Ms. Gomez with termination and/or adverse employment action on various occasions if she communicated and/or associated with Councilmember Ruiz.

128.     Due to information and belief that Ms. Gomez was with a political supporter of Councilmember Ruiz, Doral discriminated, retaliated against, and constructively terminated Ms. Gomez.

129.     Doral provided pretextual and false reasons for its disciplinary actions towards Ms. Gomez.

130.     Specifically, Doral allegedly constructively terminated Ms. Gomez, in part, because she was leaving the city limits while on duty and was inputting payroll information for other employees.

131.     The proffered reasons were mere pretexts for the violation of Ms. Gomez's First Amendment right to Freedom of Association as Ms. Gomez was doing the aforementioned at the direction of and with the permission of her supervisors and employers, including Major Jose Seiglie.

132.     Ms. Gomez's conduct of associating with Councilmember Ruiz was a substantial or motivating factor in Defendants' adverse employment actions.

133.     The conduct described herein constituted adverse employment actions and were sufficiently severe and pervasive so as to create an intolerable hostile working environment, affecting the terms and conditions of the Ms. Gomez's employment, including but not limited to, causing Ms. Gomez's constructive termination.

134.     As a direct and proximate result of Doral's actions in violation of Ms. Gomez's First Amendment right to Freedom of Association, Ms. Gomez has incurred and continues to incur damages, including without limitation lost wages, lost benefits, lost promotions, lost perquisites, termination, and other lost remuneration and economic opportunities.

WHEREFORE, Ms. Gomez respectfully requests that this Court enter a judgment against Doral awarding Ms. Gomez compensatory damages as well as costs, interest, attorneys' fees, and any such further relief this Court deems just and proper.

## COUNT V – CIVIL RIGHTS VIOLATION
## UNDER 42 U.S.C. 1983 AGAINST MAYOR BERMUDEZ

Ms. Gomez repeats and realleges each and every allegation set forth in paragraphs 1 – 77 as if fully set forth herein.

135.     42 U.S.C. Section 1983 states as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...

136.     At all times material, Mayor Bermudez, as Mayor of the City of Doral, occupied a position of final policymaking authority, and utilized his official position to influence Doral officials to participate in the illegal scheme to terminate Ms. Gomez. In doing so, by virtue of his position, Mayor Bermudez was acting under color of law.

137.     Mayor Bermudez engaged in the illegal and unconstitutional conduct described herein and subjected Ms. Gomez to the deprivation of her right to Freedom of Association pursuant to the First Amendment to the United States Constitution, and is therefore liable for the damages and other relief sought in this Action.

138.     Upon information and belief, Mayor Bermudez and Chief Gomez believed that Ms. Gomez was associated with Councilmember Sandra Ruiz.

139.     This belief was partly based on Councilmember Ruiz and Ms. Gomez's amicable relationship and common friends.

140.     Ms. Gomez's employment did not require a political affiliation. However, as an employee of the Doral Police Department, Ms. Gomez was not allowed to publicly support Councilmember Ruiz while on duty. However, she did politically associate and align herself with Councilmember Ruiz's beliefs while off-duty, like Detective Rodriguez and the other officers mentioned. At all material times hereto, Ms. Gomez conduct and political affiliation constituted an individual, legally protected association under the First Amendment to the United States Constitution.

141.     Throughout his tenure, Mayor Bermudez would command and direct the Doral Police Department chiefs, including Chief Organvidez and Chief Gomez, to forbid any officer and/or employee from associating with Councilmember Ruiz. Any violation of his command would result in the employee's termination or other adverse employment action, such as that endured by Ms. Gomez and Detective Rodriguez. Additional examples of this widespread policy include Officer Pablo Rodriguez's demotions and Sgt. Giancarlos Pelosi's and Detective Monica Vila's termination because of their association with Councilmember Ruiz. Additionally, many others, including Sgt. Chuck Weldon and Sgt. Pete Peterman, were forced to resign from the City of Doral due to the pervasive harassment and retaliation endured as a result of this same association to Councilmember Ruiz.

26

142.     Due to information and belief that Ms. Gomez was associating with Councilmember Ruiz, Mayor Bermudez threatened Ms. Gomez with termination and/or adverse employment action on various occasions if she communicated and/or associated with Councilmember Ruiz.

143.     Due to information and belief that Ms. Gomez was associating with Councilmember Ruiz, Mayor Bermudez discriminated, retaliated against, and constructively terminated Ms. Gomez.

144.     The conduct described herein constituted adverse employment actions and were sufficiently severe and pervasive so as to create an intolerable hostile working environment, affecting the terms and conditions of the Ms. Gomez's employment, including but not limited to, causing Ms. Gomez's constructive termination.

145.     Mayor Bermudez knew or should have known that his actions deprived Ms. Gomez of her constitutional rights as a set forth above, or acted with reckless and deliberate indifference to Ms. Gomez's constitutional rights, or subjected Ms. Gomez to such deprivations willfully, intentionally, maliciously, and with reckless regard to Ms. Gomez's rights.

146.      As a direct and proximate result of Mayor Bermudez's actions in violation of Ms. Gomez's First Amendment right to Freedom of Association, Ms. Gomez has incurred and continues to incur damages, including without limitation lost wages, lost benefits, lost promotions, lost perquisites, termination, and other lost remuneration and economic opportunities.

147.     The actions of Mayor Bermudez, in intentionally depriving Ms. Gomez of her rights as set forth above, rise to such a level as to warrant the award of punitive damages.

WHEREFORE, Ms. Gomez respectfully requests that this Court enter a judgment against Doral awarding Ms. Gomez compensatory damages as well as costs, interest, attorneys' fees, and any such further relief this Court deems just and proper.

## COUNT V – VIOLATION OF THE CONSTITUTIONAL RIGHT TO FREE SPEECH
### (First Amendment Retaliation Against Doral)

Ms. Gomez repeats and realleges each and every allegation set forth in paragraphs 1 – 77 as if fully set forth herein.

148.    The United States Constitution's First Amendment guarantee to free speech applies to local and state governments through decisions of the United States Supreme Court, as well as through the Fourteenth Amendment.

149.    At all times relevant hereto, Ms. Gomez was an employee of Doral.

150.    Doral is a municipal government.

151.    Ms. Gomez participated in and made certain disclosures during several investigations by local and federal government agencies, including Doral and FDLE, regarding Doral's and Chief Gomez's alleged improprieties.

152.    Ms. Gomez made several disclosures concerning improper conduct by members of the City Council and the Doral Police Department to the public.

153.    The statements and disclosures made by Ms. Gomez to the state and federal government agencies, as well as to the public, involved matters of public concern and were not matters of personal interest.

154.    Ms. Gomez was speaking as a private citizen considering the speech at hand was not made pursuant to any of her professional responsibilities as a detective for the City of Doral. In fact, her speech concerned administrative matters and malfeasance of public

employees rather criminal conduct; consequently, it did not implicate her professional duties regarding the investigation of criminal cases.

155.     At all times material hereto, Doral was aware of Ms. Gomez's participation in the local and statewide investigations and of certain disclosures she made.

156.     The statements and disclosures did not disrupt the function of the City of Doral.

157.     Therefore, Ms. Gomez's interests as a citizen in disclosing alleged improper government conduct outweighed the interests of Doral as an employer.

158.     In violation of Ms. Gomez's First Amendment right to free speech, the City of Doral, acting through its Mayor and City Council, harassed, discriminated, and terminated Ms. Gomez's employment in retaliation for the statements and disclosures she made.

159.     After Ms. Gomez's protected disclosure, the retaliation and harassment were continuous up to Ms. Gomez's termination.

160.     The conduct described herein constituted adverse employment actions and were sufficiently severe and pervasive so as to create an intolerable hostile working environment, affecting the terms and conditions of the Ms. Gomez's employment, including but not limited to, causing Ms. Gomez's constructive termination.

161.     As a result of the Doral's retaliatory termination in violation of the First Amendment, Ms. Gomez has been damaged.

WHEREFORE, Ms. Gomez respectfully requests that this Court enter a judgment against Doral awarding Ms. Gomez damages as well as costs, back pay, interest, attorneys' fees, and any such further relief this Court deems just and proper.

### COUNT VI – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Against Mayor Bermudez in his Individual Capacity

Ms. Gomez repeats and realleges each and every allegation set forth in paragraphs 1 – 77 as if fully set forth herein.

162.    This is an action, under the common law of the State of Florida, for intentional infliction of emotion distress. Such claims arise from a common nucleus of operative facts as set forth above.

163.    At all times material hereto, Mayor Bermudez intentionally, maliciously, and outrageously inflicted emotional distress on Ms. Gomez by intentionally harassing her, discriminating her, and terminating her.

164.    More specifically, Mayor Bermudez publicly disparaged Ms. Gomez, ordered her vehicle to be tracked, and for her to be monitored on surveillance cameras.

165.    The conduct was outrageous, extreme, and insulting — going beyond all bounds of decency and regarded as odious and utterly intolerable in a civilized community.

166.    Mayor Bermudez's conduct caused and continues cause Ms. Gomez severe emotional distress, including, but not limited to, embarrassment, humiliation, mental anguish, and suffering.

**WHEREFORE**, Ms. Gomez respectfully requests compensatory damages and punitive damages against Mayor Bermudez, in his individual capacity, together with prejudgment interest on all economic losses, costs of this action and a trial by jury on all issues triable as a matter of right.

### DEMAND FOR TRIAL BY JURY

Ms. Gomez demands a trial by jury of all issues so triable.

Dated this 17th day of June 2020.

Respectfully submitted,


s/Robert L. Switkes
Robert L. Switkes, Esq.
Florida Bar No.: 241059
rswitkes@switkeslaw.com
s/Maryjeanne Marrero
Maryjeanne Marrero, Esq.
Florida Bar No.: 1011715
mmarrero@switkeslaw.com
**SWITKES & ZAPPALA, P.A.**
407 Lincoln Road, Penthouse SE
Miami, Beach, Florida 33139
Telephone: (305) 534-4757
*Attorneys for Ms. Gomez*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this <u>17th</u> day of June 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Noticed of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/Maryjeanne Marrero
Maryjeanne Marrero, Esq.

## SERVICE LIST
***Yvette Gomez v. City of Doral, et al.***
**United States District Court, Southern District of Florida**
**Case No.: 20-cv-20309-JLK**

**Margaret H. Meyers, Esq.**
Lydecker Diaz
1221 Brickell Avenue, 19th Floor
Miami, Florida 33131
Phone: 305-416-3180
Fax: 305-416-3190
Email: mhm@lydeckerdiaz.com
*Attorney for Defendants*